one. May it please the court, good morning, your honors, Greg Jolly on behalf of the appellant, the sheriff of Lee County, Florida. The sheriff of Lee County, Florida has at the time the litigation was initiated has retired. There's a new sheriff. He hasn't been substituted, but that does not affect any of the issues we're here for today. There's a new sheriff in town. Yes, your honor. That's correct. Sheriff Marcino. Your honor, I'd like to focus on two issues from below. The second error relates to the question that was issued by the court about a month ago. The first issue is the jury instruction issue. As noted in our briefs, the trial court inserted some language into the jury instruction informing the jury of, uh, the legal effect of a factual finding regarding Florida's alcohol defense. Does that, does that jury instruction misstate Florida law? No, your honor, it does not. And is there any indication that the, uh, unlike, I guess in the Harrison case that you cite that, uh, that the instruction was designed to inflame the jury? Can we draw that inference? I'm not sure you can draw that inference, your honor, but it is the, um, defendant's position, the sheriff's position that, um, the, that it was unnecessary, that it could have impacted the jury's decision. Um, in the Harrison case that the sheriff cited to the fifth DCA indicated that it was highly improper for the jury to be informed of the legal effect of its factual finding. Well, well, I mean, I guess in fairness, Harrison's though is different. It was highly improper in the context of not the court instructing the jury, but a lawyer sort of inflaming the jury. And as I recall in that case, it was sort of part of a cumulative error analysis, right? So we're like two steps removed from Harrison. Yes, your honor. And I would, I would suggest respectfully that, um, when the error is committed by the trial court where the trial court is instructing the jury, that that, uh, increases the prejudice because we're all aware a jury is instructed. You may ignore what a lawyer says, but you must not ignore what the, what I instruct you on the law. And I would also suggest that the verdict form also, which reinforced that the, uh, that the claim would be barred, um, that also adds to the prejudice. So, so, I'm sorry, go ahead, Judge Branch. Um, can you give me a federal case where an accurate statement of law was held to be prejudicial? I'm not sure if prejudicial is the right, um, word, your honor. We cited to some cases in our brief, um, and it was more related to a comparative back when, uh, comparative negligence, uh, acted as a bar where in some jurisdictions, and I believe it was federal, um, where, where some jurisdictions said, juries don't need this information. Um, it could taint, uh, their legal determinations. Um, these legal rulings are for us as the judges to, uh, and to, um, issue based on factual findings. So, so, um, I, we haven't compared notes about this, but Judge Branch and I, I guess we're both commercial litigators before we, uh, became judges. I mean, I seem to see, I seem to recall having seen a lot of verdict forms that say, you know, if you answer a question 1B, thus and such, you can stop. I mean, I thought verdict forms always did that, really. How is that really, how is this any qualitatively different from that? You can stop because one party is going to prevail at this point. I would suggest under the circumstance of the alcohol defense, um, we, we had a jury, we had a verdict form that, um, we proposed where they would keep going even if they, they found that there was 50% at fault and intoxication, where they still answered the damage question. So there, there is no indication that the claim would be barred. And, uh, I think under, under Florida law, that, that would be how it's done. Does Florida law govern this? It seems to me that under Erie, this is, this is federal. Certainly, Your Honor, certainly under Erie, the federal law would apply. And I would suggest that for, sorry, federal rule of civil procedure 49A specifically says, um, juries are, I shouldn't say specifically, but, um, it says something to the effect of juries should be instructed on only what is necessary. And when we cited to a case, and I'm sorry, I don't have it off the top of my head, um, that says, um, when they're instructed on anything more than that, that that is improper. Yeah. Right. Miller says it's the preferable rule though, is that it's not error to allow the jury to know the legal effect of its answers. That's and that's, that's where the federal courts are, right? Uh, I'm not sure that every federal court is that way, but Your Honor, did you find a federal court that's not that way? Well, we cited to some cases in the Ninth Circuit, Your Honor, where they, um, Your Honor, unless there's any more questions on that issue, I would rely on the arguments in the brief and I'll move on to the side of the move on after you, yes, Your Honor. Um, the second issue relates to the, the negligent use of force issue. Um, I know Your Honor, um, submitted that question and asked us what would be submit, what, what the district court would do. The problem to me is this, you've got an argument about the state of Florida law, an interesting argument, one that in a proper context might be certified to the Florida Supreme Court. Um, but it seems to me that the problem is you've only appealed the denial of the motion for new trial and your, but your argument is one that would support an, uh, an appeal from a denial of a motion for judgment as a matter of law, but you didn't appeal that. So I'm at a loss to know what we do about that. Uh, Your Honor, I would suggest that under Florida law, it is firmly established that there's no such cause of action for a negligent use of force. So you want a new trial on, on this non-existent cause of action? I don't understand that. No, Your Honor. I'm sorry. Um, there is, it is firmly established that a claim exists for a negligent welfare check. Um, and that's the Wallace v. Dean case. Now under Florida law, one who is negligent is not absolved if they set in, in motion a chain of events that leads to foreseeable harm. That's why we don't necessarily think, uh, we're entitled to judgment as a matter of law. If a jury determines that, um, the, the execution. The problem it seems to me though, is that that's not the way you presented this argument in the brief and you don't really tell us how, if we were to remand this, how this, how the jury should be instructed, what the proper instruction would be, here's the instructions we offer that the district court didn't give. I'm at a total loss to know what this new trial would look like. Well, I would say, Your Honor, the, the, the new trial should be limited to litigating the circumstances of the welfare check itself. Um, and it, and it should be, she should not be able to call into question the reasonableness of the shooting. So, Your Honor, for instance, and, and, uh. But you understand that there's really no way to try this case without referencing the shooting. Yes, Your Honor. And I think the shooting itself, the damages flow from the shooting, but the, the reasonableness of the shooting itself, um, um, should not be litigated. So in other words, the jury should decide, is it foreseeable that in the execution of a negligent welfare check, that a deputy might be justified in using deadly force? The deadly force was reasonable, but was it foreseeable that they caused themselves to have to use reasonable force? Um, and obviously that becomes a question of foreseeability. And, and I would respectfully, I don't think that we would contest that it might be foreseeable that if you enter a private person's home, they might retrieve a firearm necessitating the use of deadly force in self-defense. Um, but that would be, that would be ought to the sheriff's position, that the litigation should be limited to, um, the, the circumstances of the welfare check, whether how, whether if they executed the welfare check reasonably, did they turn the lights on? Did they say the, the, uh, the homeowner's name, uh, things like that, factual issues like that, not they didn't order her to drop the gun. They shot through a door that's already been litigated that, that, that has been determined as being reasonable. Hang on, hang on, hang on. So, so maybe I'm missing something and feel free to tell me that I am so, but I thought when you say it's already been litigated, those issues were effectively assumed in Ermini's favor, right? At the motion to dismiss stage and the court says to Ermini, you lose anyway on the excessive force claim. I'll assume that, um, Ermini, uh, pointed the gun. I'll assume that, uh, the deputies, uh, warned, but, uh, Ermini, you lose anyway. It was, it was a motion to, uh, for summary judgment stage. I'm sorry. Yeah. Um, I don't mean, it just strikes me that to the extent you're making something like collateral estoppel argument, those issues weren't really litigated or actually adjudicated. They were assumed and, and, and frankly assumed in Ermini's favor. She lost anyway. I would just suggest that any criticisms of the shooting itself are not properly before the jury because that would be a negligent use of force claim. I'm just trying to figure out, I guess, if you, if you think that, that the, the theory is sort of barred on a, like a collateral estoppel-ish basis, or you just think it's sort of, uh, impermissibly overlapping or what, what exactly the problem is? I would think, I think it's the former, your honor. I don't think the claim is barred. Clearly there's a claim for a negligent execution of a welfare check. Um, but then the question is what, how, how should she be permitted to try that claim? And you're saying she should be, uh, prohibited from arguing certain facts. I would say anything that would call into question, from the sheriff's perspective, um, when, when the plaintiff, um, is shot, um, no, I'm, I'm misstating that. I guess, let me, let me ask you this, maybe I'll be more pointed. Are you saying she should be prohibited from arguing certain facts because those facts were adjudicated against her in the excessive force claim at the motion for summary judgment? Partially, your honor. I think the, the, it certainly was the sheriff's position resolved against her, but also there's no such claim as a negligent use of force claim. There we go. Okay. I mean, that, that. So we're sort of just, um, uh, it may be on me, but I feel like we're sort of in a, in a cycle. It's probably me, your honor. I don't know. It's, it's, it's all good. It's confusing. As Judge Pryor said, it's, it's interesting. My time is up, your honors. If you have any more questions, otherwise I'll reserve my time for rebuttal. You've got four minutes. Yes, your honor. Ms. McAllister. Good morning, your honors. Colleen McAllister. I represent the appellee, Patricia Ermine. Um, with respect to the jury instructions, um, of course, my argument was that the court, um, and made this point, uh, during all of the many conferences we had on these instructions that the jury instruction he gave did mimic the law. Um, Mr. Jolly objected to that and said, that's harsh. And he says, it's a harsh law. Uh, however, he was willing to consider prejudice because he took out the, the mention of drugs because the drugs in the statute refer to illegal drugs and there was going to be no So he did understand that there was some prejudice if you had something in that instruction that, that was not going to be before the court, but his position was it's the law and I'm going to leave it in. Um, I would point out that contrary to the argument you heard, the only person that mentioned all of that in closing argument when the jury had instructions up on the screen was counsel for the appellate who said, by the way, 50% more at fault, there's 50% more at fault. There's no recovery. I didn't mention it at all. Not at all. Um, so I would ask that the court on that issue, you know, let the instruction stand. It properly stated the law. I could find nothing that said that if you properly state the law, that there's something wrong with the jury instruction. Um, the issue of whether it was designed to inflame the jury, uh, like I say, the court considered that and it did take out the illegal drug thing because he did, they did think there was no evidence of that. Let me move on to negligent use of force, which I was prepared for. Um, I find it incredibly interesting that counsel kept mentioning foreseeability here today. Um, I put in my initial, my answer brief that my jury instructions, my proposed jury instructions track the language of Wallace v. Dean and track the language of Judge Steele's order on summary judgment, which was they had a duty of care. They had a duty to lower the risk of harm. They had a duty to consider whether what they did resulted in the foreseeable. Did she act in a foreseeable manner based on their actions? The sheriff's judge or jury instructions were a straight negligence claim. And now it seems to me that we're standing here today and they're arguing foreseeability, which they didn't want in the jury instruction went before we went to trial. You know, I figured I could live with the negligence claim. But initially we had very competing jury instructions on this issue. He asks this court today to limit the circumstances of the shooting. I would say, first of all, that Hermione was clear from the start what was before the jury. In her opening statement, she said, the issue of how the well-being check was conducted is but for the failure of three deputies to communicate properly and effectively with a frightened woman, the series of events that culminated in her grievous wounds would not have, would have, could have been avoided. In closing, I said, we are talking about the series of events from the moment the bedroom door was opened until shots were fired. They understood the part of the case that they were to consider. However, the facts in this case are inextricably interwoven. You can't start separating one fact from the other. As Judge Presnell said, the issues were simple, but the facts were highly disputed. And the jury, it's the jury's purview to decide those disputed facts. So they need to know the whole story. And the whole story is from the time they walked through the door until the time she left in the ambulance. That's the whole story. But their consideration and the focus of Hermione's case was always on the communication that happened between the deputies and Ms. Hermione. Judge Presnell agreed with me that the failure of the plaintiff to drop her weapon was an issue for the jury to consider, particularly when you look at the testimony at trial. Their versions of what happened right before shots were fired were very different. So let me see if I can get some clarity on the problem that I guess I'm having a hard time getting my mind around. So he says though that your argument, you tried the case as well? Sounded like it. Pardon me? You tried the case as well? I did, yeah. Okay, so your argument, he says, impermissibly focused on the fact that Hermione never pointed the gun, that the deputies failed to issue a warning. And he says that's negligent use of force stuff, that effectively on the excessive force claim and summary judgment, you lost. And so do you understand his argument to be sort of bound up in a collateral estoppel type of argument, that because you lost before, you can't do it now? Or is it something different? Because it does seem to me that the facts do, as Judge Brandt said, they just sort of overlap in sort of a mushy way. It'd be hard to sort of pull them limb from limb. But is he saying that there's some external impediment to you being able to make those arguments now? I don't believe so. And neither did Judge, the facts in this case proceeded from A to B to C. But the issue was, did the way they, and of course, if we'd had a foreseeability jury instruction, that might have helped. But the issue was, did their negligent conduct of the well-being check culminate in a person getting shot? Now, they also had to decide proximate cause. And you can't decide the issue of proximate cause for damages without knowing all of the facts. I didn't really read it as an estoppel argument. I originally read, I initially read their initial brief as, I tried a negligent use of force claim. And Judge Bresnell, in his order, said she didn't try a negligent use of force claim. She tried a claim, and his words were, the actions of the deputies, including the failure to order the plaintiff to drop her weapon, could be considered by the jury in deciding whether the deputy's actions during the welfare check, which culminated in the plaintiff being shot, were conducted in a reasonable manner. I thought that was interesting. Culminated was the very word I used to the jury. So they were considering whether, and I have to say, they said I impermissibly, continuously made this argument. Of course, there were no cites to the record on that. And I cited to the record in my brief, and I said, I mentioned in a series of things that you would not hear. You will not hear that they called her by name. You will not hear that they told her they were doing a wellness check. You will not hear that they were there because of her daughter. You will not hear that they asked her to drop her weapon. Understand, this lady did not know her life was in danger at that moment in time. So that was the first reference I made. The second reference I made, and keep in mind as well, there were three deputies in that house. Only one of them had a claim for excessive force against it. Only one of them shot the weapon. But the other two deputies still had a burden to conduct the welfare check in a reasonable manner. Two of them were standing at the door when the gun went off. So I asked Deputy Palmese, did you hear anybody say, drop your weapon? I asked that question at trial without objection, and she said no. I asked Deputy Hammer, did you tell her to drop her weapon? He said no, there wasn't time. That was his position. Hermione's position on what happened right before shots were fired was very different. That's the last time I mentioned it. I never mentioned it in closing. I didn't even ask Lisenby, unfortunately, I looked in the record. But I didn't even ask Lisenby whether he asked it. So this notion that I continuously referenced, drop the gun, is just simply not supported by the record. And the court agreed with me. I'm really at, I can't really see. The judge sat there, I'll tell you this, he told us more than once. He knew what Judge Steele had absolutely decided about the gun. He knew how Judge Steele got to the finding of, you know, the finding of dismissing the excessive force claim. And which issues relative to that, Judge Steele said, they're disputed. I don't need to go there. I just need to say, she said she had a gun. He had a right to think that she had access to the gun. And he didn't have to wait to find out to get shot. That was his finding. And actually, he said, even if I'm wrong, even if I'm wrong, you know, there is no case on point that speaks to this particular set of circumstances, so he's entitled to qualified immunity. But he left all those issues. Did she point the gun? I mean, I was sitting there with an opening statement where my opposing counsel said, she cranked one off. And I would point out, I'm not real sure when I started looking at the reply brief and saying, well, what facts would we chop out so that the jury understood what happened? And I'm also not real sure what their affirmative defenses would be. Their affirmative defenses were directly related to the shooting. You know, she was drunk and irrational. And so, you know, she pointed a gun. And, you know, he said in opening statement, you know, if you point a gun at somebody, you're gonna get shot. I don't know, that doesn't have much to do with communication. That has to do with, you know, the shooting. So I had to keep bringing the jury back to the notion, did you ask this question? Did you ask this question? And I'll tell you, once the jury heard the testimony of Commander Reardon, who was the highest ranking officer to testify and was the person that was two, three, four ranks above the officers that day. I mean, she said, I'd walk in. She absolutely told the jury, under these circumstances, she would not have opened the door. She said she'd walk in. She'd tell them she was there for a wellness check. She'd tell them they weren't there to hurt. You didn't need a gun. We're not there to hurt you. We're just here to check and see how you are. She went through a whole list of questions that she would have asked. And then said, I certainly never would have opened that door. I'm not sure what they expected would happen. I don't find particularly someone saying, get out of my house. I have a gun, to be irrational. However, all they had to say there was, ma'am, you don't need a gun. We're not here to hurt you. But they didn't. So for me, from the day I first read the facts in this case, before I even filed the complaint, you can go back and look at the complaint, it was so simple to see, if you had only talked to this lady, there would have been no shooting. So the fact of the shooting, I don't think, truthfully, that Deputy Hammer walked in that evening with intent to shoot anybody. And I certainly know that Hermione never would have pointed a gun at a deputy. And there's no evidence that she ever would have. So I go back to, that is a consequence. That is the but for of a negligence complaint. But for all of this negligent conduct of the welfare check, none of this would have happened. I argue to the jury that negligence claims are often about a lack of common sense. And I said, if only these deputies had treated this claim, had treated this common sense, a good example was Deputy Palmese testified on cross-examination. That they never give their name, and they never use the name of the person that they're talking to. Well, this wasn't a traffic stop. This was three people that walked into a house without consent, without a warrant. It was pitch dark in the house. They opened a bedroom door and found an elderly lady asleep on her bed in her bra and her underpants, and they shined a flashlight on her. I can't think of anything that lacks more common sense than that. I do believe, and I have believed from the start, that the issue of the shooting was not about the shooting and whether it was reasonable. I don't question Judge Steele's order. I accepted Judge Steele's order. I didn't appeal Judge Steele's order. The issue was what these deputies did before that happened. And I would suggest that that was the issue. There was never a case. I understand the court's concerns about not wanting to have confusing law about negligent use of force claims. But I think in this case- Don't misunderstand me. I mean, all of that was about did you really frame your argument on appeal correctly or not, okay? So, I think- I think that I would ask this court, I do not- I look at Judge Presnell's order. He sat through this trial. He listened to all the evidence. He listened to all the testimony. He had studied Judge Steele's order on summary judgment. And he found that there wasn't a negligent use of force claim. He found that the facts were disputed with respect to the gun, with respect to the question about. And I would ask this court to find that he did not abuse his discretion and affirm his decision at the trial level. In the district court. Thank you, Ms. McAllister. Mr. Jolly, you've saved a few minutes of our rebuttal for. Your Honor, the summary judgment order as it relates to the negligence claim. In that order, it says tribal issues of fact exist as to whether the deputies exercise reasonable care in carrying out the welfare check, which increase the harm to MAPES, and whether MAPES's actions were a reasonably foreseeable consequence of the negligent acts or omissions of the deputies. That's the claim that we're asking should be retried and opposing counsel. Based on what? I'm sorry? Based on what? Based on an argument that there's no such thing as a negligent use of force theory. And that's not the theory that you just described. Based on that there is a negligent commission of a welfare check claim. Right. And Ms. McAllister gave- It seems like the district court recognized that. Right. And I think, Your Honor, while it's certainly the sheriff's position, Your Honor, that Ms. McAllister gave some examples for what that claim should entail. They didn't say Ms. Ermini's name. They didn't say the daughter called. They didn't say, we're here to help you. You don't need your gun. These are appropriate issues for the jury. Right. She can certainly- She made arguments about that at trial, didn't she? She did. But she also called into question the reasonableness of the shooting itself. That's where the error comes in, Your Honor. She should not be able to relitigate the reasonableness of the shooting itself. I would concede that it is foreseeable, and she made an argument that we didn't have foreseeable in the jury instructions. It is foreseeable that if a law enforcement officer goes into someone's They might retrieve a firearm. And then the question is, did whatever they did inside the house, was that reasonable, and was it foreseeable that they might have to use deadly force? And the damages would flow from that. There were some other issues that were raised by opposing counsel. Number one, they didn't just go into this house. They got a call from the plaintiff's daughter saying, my mother is, she's been drinking and she's suicidal. That's why they went in the house. It's not like they just walked into the house. Your Honor, unless the court has any more questions, I'm going to stand on the arguments in the briefs, and thank you. Thank you. Go to the last case. Sitting